**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW MEXICO**

TANYA SANCHEZ, individually and
on behalf of M.S., her minor daughter,
VINCENT SANCHEZ, and
DANIELLE BRIZENO,

      Plaintiffs,

v.                                                                                    Civ. No. 13-444 GJF/KRS

DANNY SURRATT, SHIRLEY SEAGO,
and JASON DAUGHERTY, in their
individual capacities,

      Defendants.

<u>**ORDER GRANTING DEFENDANT**</u>
<u>**DANNY SURRATT'S MOTION FOR SUMMARY JUDGMENT**</u>

This matter comes before the Court on Defendant Danny Surratt's ("Defendant's") "Motion for Summary Judgment" ("Motion"). ECF No. 69. After careful consideration of the pertinent law and the parties' briefing, the Court will **GRANT** the Motion and **DISMISS** the 42 U.S.C. § 1983 claim set forth in Count I of Plaintiffs' Complaint against Defendant **WITH PREJUDICE**. Furthermore, because this dismissal extinguishes the only federal claim against Defendant over which this Court had original jurisdiction, the Court will decline to exercise supplemental jurisdiction over the remainder of Count I or the entirety of Count V. The Court's reasoning follows below.

**I.      BACKGROUND AND PROCEDURAL HISTORY**

This case arises from the alleged sexual assaults of M.S. and Danielle Brizeno, who at the time of the attacks, were both minor children of Plaintiff Tanya Sanchez. Pls.' Compl. ¶ 1, ECF No. 1. M.S., the younger of the two, was only nine years old when she was attacked. *Id.* ¶ 9. At

that time, Defendant worked as a deputy sheriff in the Lea County Sheriff's Office in Lea County, New Mexico. *Id.* ¶ 10. On May 5, 2010, Defendant picked up M.S. from her school and drove her home while on duty, in uniform, and by way of his government-issued vehicle. *Id.* ¶¶ 17-18. Plaintiffs allege that, later that day, Defendant molested M.S. *Id.* ¶ 19. Plaintiffs also allege that, on May 15, 2010, Defendant molested M.S. again. *Id.* ¶ 20. That same day, M.S. reported her molestation to her older sister, Danielle Brizeno. *Id.* ¶ 21.

Danielle Brizeno is also the daughter of Tanya Sanchez. *Id.* ¶¶ 1, 3. She alleges that in the summer of 2009, when she was fifteen years old, Defendant entered the home where she resided and also sexually molested her. *Id.* ¶¶ 12-14. Ms. Brizeno did not report the assault at that time, but after hearing her younger sister's account of being assaulted by Defendant on May 15, 2010, she chose to report her own assault to her parents and to her grandmother. *Id.* ¶¶ 15, 21, 28.

On May 5, 2013, Plaintiffs filed their Complaint, alleging *inter alia* that Defendant, while acting under the color of law: (1) in Count I, deprived M.S. of substantive due process in violation of 42 U.S.C. § 1983 [*Id.* ¶¶ 51-57]; (2) in Count I(a), committed the state tort of battery against M.S. [*Id.* ¶¶ 58-62]; and (3) in Count 5, committed the state tort of battery against Ms. Brizeno. *Id.* ¶¶ 87-90. Defendant filed his Motion on August 17, 2017. ECF No. 69. Plaintiffs filed their "Response to Defendant Surratt's Motion for Summary Judgment" ("Response") on September 11, 2017. ECF No. 75. Briefing concluded with the filing of Defendant's Reply on September 22, 2017. ECF No. 78.

## II.    SUMMARY OF ARGUMENTS

Defendant argues that Plaintiffs' § 1983 claim must be dismissed because it "depends on a showing that [Defendant] was acting under color of state law," and by his estimation, no such

showing can be made "under either the undisputed facts or applicable law." Def.'s Mot. 8, ECF No. 69. He contends that "M.S. has no evidence to show that [Defendant] used his authority as a deputy sheriff either to lure M.S. away from her school or to compel her involuntarily to leave school with him." *Id.* at 11. Furthermore, he asserts that "M.S. has no evidence to present at trial that [Defendant] in any way acted as a deputy sheriff at the time the alleged assault took place." *Id.*

Defendant explains that "this is not a case in which [Defendant] could not have abused M.S. but for his status as a deputy sheriff." *Id.* at 12. Rather, he emphasizes that he "had a pre-existing familial relationship with M.S." and that M.S. "considered him to be her grandfather, and she called him 'Papa.'" *Id.* (citation omitted). As a consequence, he notes that he was a frequent visitor in the home of M.S., as she was in his. *Id.* Defendant contends that these frequent contacts led M.S. to get "used to" seeing him in his government-issued vehicle, just as she was accustomed to seeing him in his uniform, with his badge, gun, and handcuffs affixed to his belt as part of the same. *Id.* at 13. Thus, while these indicia of his office were present on the first day he allegedly assaulted M.S., he argues that "[f]rom the time that the school contacted [Defendant] to pick up his sick granddaughter, his dealings with M.S. mirrored the earlier interactions he had with her for much of her life." *Id.* at 14. Therefore, he concludes that his "private conduct on May 5 was not action taken 'under color of state law.'" *Id.*

Plaintiffs respond that Defendant did, in fact, operate under color of state law when he assaulted M.S. They argue that Defendant "showed his authority by presenting himself in his state[-]issued uniform and badge" when he arrived at the school to pick up M.S. Pls.' Resp. 10, ECF No. 75. Furthermore, Plaintiffs highlight that Defendant "did not change clothes or cover his badge," nor did he "clock out or take leave." *Id.* To the contrary, they observe that

Defendant "was on duty at the time" he picked up M.S. *Id.* Lastly, Plaintiffs emphasize that Defendant used a "state[-]issued vehicle as the means to transport the minor victim so that he could commit the sexual assault." *Id.* Although Plaintiffs concede their showing is "close," they nonetheless conclude "there is sufficient factual basis in the record showing state action involved in the commission of the tort." *Id.* at 11.

## III. SUMMARY JUDGMENT STANDARD

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The entry of summary judgment is mandated "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The party who will bear the burden of proof at trial on a dispositive issue must designate specific facts showing that there is a genuine issue for trial. *Id.* at 324. In order for an issue to be genuine, the evidence of it must be such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). If there is not sufficient evidence favoring the nonmoving party, there is no issue for trial. *Id.* at 249. Furthermore, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citing *First Nat. Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 289 (1986)) (internal quotation marks omitted).

At the summary judgment stage, "a plaintiff's version of the facts must find support in the record." *Thomson v. Salt Lake Cnty.*, 584 F.3d 1304, 1312 (10th Cir. 2009). As with any

fact asserted by a party in a summary judgment motion, the non-movant must point the Court to such support by "citing to particular parts of materials in the record[.]"  FED. R. CIV. P. 56(c)(1)(A).  All material facts set forth in the motion and response that are not specifically controverted are deemed undisputed.  D.N.M.LR-Civ. 56.1(b).

Because it decides motions for summary judgment by viewing the facts in the light most favorable to the non-moving party, the Court obeys three general principles.  First, the Court's role is not to weigh the evidence, but only to assess the threshold issue of whether a genuine issue exists as to material facts such that a trial is required.  *See Liberty Lobby*, 477 U.S. at 249.  "An issue is 'genuine' if there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way.  An issue of fact is 'material' if under the substantive law it is essential to the proper disposition of the claim."  *Thom v. Bristol Myers Squibb Co.*, 353 F.3d 848, 851 (10th Cir. 2003) (internal citation omitted).  Second, the Court resolves all reasonable inferences and doubts in favor of the non-moving party, and construes all evidence in the light most favorable to the non-moving party.  *See Hunt v. Cromartie*, 526 U.S. 541, 550-55 (1999).  Third, the Court cannot decide any issues of credibility.  *See Liberty Lobby*, 477 U.S. at 255.  "[T]o survive the . . . motion, [the non-movant] need only present evidence from which a jury might return a verdict in his favor."  *Id.* at 257.  Nonetheless, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts[.]"  *York v. City of Las Cruces*, 523 F.3d 1205, 1210 (10th Cir. 2008) (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)).

## IV.    UNDISPUTED FACTS

The Court divides this section into two parts:  (1) undisputed material facts submitted by the parties, and (2) disputed material facts submitted by Plaintiffs in their response.

### A.    Undisputed Material Facts

In his Motion, Defendant advances sixty (60) undisputed material facts [Def.'s Mot. 2-8] that Plaintiffs admit to be undisputed.  Pls.' Resp. 2.  In addition, Plaintiffs advance seventeen (17) undisputed material facts that Defendant admits in form only.  *See id.* at 2-6; Def.'s Reply 3, ECF No. 78.[1]

### 1.    Defendant's undisputed material facts

1.    Plaintiff M.S. was born in March 2001.  In May 2010, M.S. was nine years old.

2.    Plaintiff Tanya Sanchez is the biological mother of M.S.

3.    Rose Surratt is the biological mother of Tanya Sanchez and is M.S.'s grandmother.

4.    Rose Surratt and Defendant are husband and wife.

5.    In 2010, M.S. resided in Lovington, New Mexico, and lived with her biological parents and her two siblings.

6.    In 2010, Defendant and Rose Surratt also resided in Lovington.

7.    Defendant and Rose Surratt's home was approximately two miles from the house in which M.S. lived with her family.

8.    Defendant and Rose Surratt's home was "right down the street" from where M.S. went to elementary school.

9.    As of May 2010 – the month in which the two incidents involving Defendant alleged in Plaintiffs' Complaint took place – M.S. had known Defendant for almost half of her life.

10.    Before May 2010, M.S. considered Defendant to be her grandfather and called him "Papa."

11.    Before May 2010, M.S. described her relationship with Defendant as "good."

---

[1] The Court uses the paragraph numbering and lettering schemes used by the parties in their briefing.  Further, where facts remain undisputed, the Court omits the parties' internal citations.

12.     During the first part of 2010, Defendant and Rose Surratt were at the house in which M.S. lived with her family "maybe three times a week" and for holidays.

13.     During the first part of 2010, M.S. went to Defendant and Rose Surratt's house often, "[p]robably three times a week" and also went there for Thanksgiving.

14.     M.S. would go to Defendant and Rose Surratt's house after school, and also would go there when her parents were not around.

15.     Before May 2010, M.S. had spent the night at Defendant and Rose Surratt's house.

16.     Before May 2010, Defendant had picked M.S. up from school when she was sick and her parents were unable to come to get her because they were working out of town.

17.     In May 2010, Defendant was employed as a Lea County deputy sheriff.

18.     As a Lea County deputy sheriff, Defendant wore a uniform, wore a badge on his uniform, and carried a gun.

19.     As a Lea County deputy sheriff, Defendant drove a vehicle that was marked as a Lea County Sheriff's Department vehicle.

20.     In May 2010, Defendant normally worked as a deputy sheriff on weekdays from roughly 7:00 a.m. until 3:00 p.m.

21.     While employed as a deputy sheriff, Defendant received a salary.

22.     Before the alleged incidents in May 2010, Defendant frequently drove M.S. to school while on duty as a deputy sheriff.

23.     Before the alleged incidents in May 2010, Defendant frequently picked M.S. up at school and took her home while on duty as a deputy sheriff.

24.     The Lea County Sheriff's Department was aware of, and did not object to, Defendant taking M.S. to school while on duty as a deputy sheriff.

25. As of May 2010, M.S. knew that Defendant was a deputy sheriff.

26. M.S. understood that Defendant wore a police uniform, and she saw him in his uniform "[m]ostly every time [she] saw him during the weekday . . . ."

27. M.S. saw Defendant both when she went to his house and when he came to the house in which M.S. lived with her family.

28. As of May 2010, M.S. was used to seeing Defendant in his uniform.

29. M.S. knew that Defendant wore a badge on his uniform, and had seen the badge when Defendant wore his uniform.

30. M.S. knew that Defendant carried a gun inside a holster when he was in uniform, and had seen him wear a gun when he was in uniform.

31. M.S. knew that Defendant carried handcuffs on his belt when he was in uniform.

32. On occasion, while wearing his police uniform, Defendant would drive M.S. to school or pick her up at her school and take her home.

33. M.S. knew that Defendant drove a police car that had "Lovington or sheriff's office or something on it" and that "looked like a police car with the police car designs."

34. Defendant occasionally would drive M.S. to school and pick her up from school while driving his police car.

35. Before May 2010, M.S. had been a passenger in the police car driven by Defendant "multiple times," and as she described it, "I thought I was cool because I got to ride in the cop car."

36. When M.S. was alone with Defendant when he drove his police car, she would sit in the front of the car.

37. In May 2010, M.S. was in third grade.

38.     May 5, 2010 was a Wednesday.

39.     On May 5, 2010, Tanya Sanchez was working in Hobbs, New Mexico, and was not in Lovington.  M.S.'s father was also at work.

40.     Sometime after lunch, M.S. started feeling sick.  She told her teacher she was not feeling well, and her teacher sent her to the school nurse.

41.     The school nurse made the decision that M.S. should go home.

42.     Because the school was not able to locate either Tanya Sanchez or M.S.'s father, the school contacted Defendant to pick up M.S. at school and take her home.

43.     The school did not call the sheriff's office to ask that they send someone to take M.S. home; the school specifically called Defendant because he was M.S.'s "Papa."

44.     Defendant came to M.S.'s school wearing his uniform and badge and driving his police car.

45.     This uniform and badge were the same ones that M.S. had seen Defendant wear on other occasions.

46.     The police car was the same one that M.S. had seen Defendant drive on other occasions and was the same police car in which she had ridden with Defendant on other occasions.

47.     When Defendant came to the school to pick up M.S.:

        A.      He did not identify himself as a deputy sheriff or the sheriff.

        B.      He did not put M.S. in handcuffs.

        C.      He did not take his gun out of his holster.

        D.      He did not force M.S. to go with him.

48.     When she left the school with Defendant, M.S. sat in the front seat of the police car.

49. When Defendant came to the school, M.S. assumed that she was going home; she did not think that Defendant was taking her to the police station or to jail.

50. After Defendant picked up M.S. at school, he took her straight home.

51. Before May 5, 2010, Defendant had been with M.S. in the house where M.S. lived with her family.

52. May 15, 2010, was a Saturday.

53. Because it was a Saturday, Defendant was not working as deputy sheriff on May 15, 2010.

54. On Saturday May 15, 2010, M.S. did not think that Defendant was working as a deputy sheriff.

55. M.S., her sister Danielle, and her brother Keith had been staying with Defendant and Rose Surratt for several days before May 15, 2010.

56. The children had been staying with Defendant and Rose Surratt at the request of Tanya Sanchez while she was out of state and their father was in a rehabilitation facility in Texas.

57. On May 15, 2010, M.S. was staying with Defendant and Rose Surratt because they were her grandparents.

58. At the time of the alleged incident on May 15, 2010, Defendant was not wearing his uniform, he was not wearing his badge, he was not carrying handcuffs and he was not carrying a sheriff's office gun.

59. On May 15, 2010, Defendant did not take M.S. anywhere in his police car.

60. The alleged incident on May 15, 2010, took place on the couch in the living room in Defendant and Rose Surratt's home while M.S.'s little brother Keith was in the room.

## 2.     Plaintiffs' undisputed material facts[2]

1.      The misconduct that forms the basis of this suit arose when, on May 5, 2010, Defendant picked up nine-year-old Plaintiff M.S. early from school and took her home.  At her home, Defendant proceeded to rub her belly with olive oil and went down with his hand, rubbing her vagina, which she referred to as her "number one."  After touching her in the "bad spots," Defendant left.

2.      After Defendant molested nine-year-old M.S., he told her not to tell Rose Surratt, who she referred to as her "Nana."

3.      On another occasion, on May 15, 2010, M.S. was alone with her little brother and Defendant.  She was watching Spongebob on TV while her brother was playing on the ground when Surratt sat next to M.S. on the couch.  He lifted up her shirt and started to rub her on her stomach and vagina, which M.S. testified as her "bad spots," or parts where her bathing suit covers her and her "number one" where she goes to the bathroom.

4.      Defendant told M.S. to not tell "Nana."  He said it was "a little secret."

6.      M.S. told her sister about what happened and her sister reported it to her mother, who notified the police.

7.      M.S.'s father, Vincent Sanchez, took M.S.'s underwear and gave them to New Mexico State Police.

---

[2] Under Local Rules, a non-movant may also set forth a version of undisputed, material facts.  The Rule, in relevant part, provides:

> The Response may set forth additional facts other than those which respond to the Memorandum which the non-movant contends are material to the resolution of the motion. Each additional fact must be lettered and must refer with particularity to those portions of the record upon which the non-movant relies.

D.N.M.LR-Civ. 56.1(b).

8.      Defendant's DNA was found on the inside crotch area of those underwear.

9.      Defendant's wife, Rose Surratt, also worked with the Lea County Sheriff's Office.  Her first reaction to the allegations against Defendant was "What in the world is the matter with you? Don't you know you could go to jail and lose your job and everything you have?"

10.     Defendant was found guilty and convicted of sexually molesting M.S. after a jury trial. The criminal convictions were affirmed by the New Mexico Supreme Court.

11.     Defendant also molested M.S.'s sister, Danielle Brizeno, as fifteen-year-old Brizeno testified at the preliminary hearing in the criminal case against Defendant.  According to Brizeno, Defendant told her that he wanted to check her and see whether or not she had sex, but Brizeno lied and told him that she was on her period so he could not check her.  Defendant told her "I have done this.  This is normal.  I have done this plenty of times."

12.     On another occasion, Defendant rubbed olive oil on Brizeno's stomach when she was sick and started to rub around her private area, telling her he was checking for fever, placing his finger inside of her vagina until she said that it was hurting her.

13.     On May 5, 2010, on the day and time when Defendant is alleged to have committed the first egregious torts against minor Plaintiff M.S., Defendant was a sworn, salaried deputy sheriff in Lea County.

14.     At the time Defendant is alleged to have committed the first violations upon M.S., Defendant was on duty as a sheriff's deputy, working the day shift from 7:00 a.m. to 3:00 p.m.

15.     Defendant was driving a government-issued police vehicle with red lights on top and "Lea County Sheriff's Department" insignia.

16.     At the time Defendant is alleged to have committed the first violations upon M.S., he was wearing a Lea County Sheriff's Office uniform.  He wore a badge of office, as well as a shirt with patches on his arm and insignia on the collar that indicated he was law enforcement.

17.     At the time of the violation, Defendant was wearing his department issued .40 Glock firearm, his duty belt, and handcuffs.

21.     Defendant did not clock out when he picked up M.S. and molested her.

    **B.     Plaintiffs' Disputed Facts**

<u>Disputed Fact No. 5</u> – Plaintiff advances the proposition, based on the testimony of M.S., that "she was scared because 'Papa, he has guns right there for hunting and deer and stuff.'"  Pls.' Resp. 3 (citing *id.*, Ex. 2, at 7 (Prelim. Hr'g Tr. 57:9-10, Nov. 18, 2010)).  Defendant does not dispute this fact "to the extent that it correctly recites the testimony given at the [p]reliminary [h]earing," but objects to the nexus Plaintiffs seek to create between the guns in question and Defendant's status as a deputy.  Def.'s Reply 3.  Defendant refers to the testimony of M.S. herself, who acknowledged the guns were for "deer and stuff" [Pls.' Resp. 3], and argues that these represent "purely personal pursuits entirely unrelated to his conduct as a deputy sheriff." Def.'s Reply 3.

    The Court will admit Plaintiffs' Undisputed Fact No. 5, as it represents a fair recounting of M.S.'s testimony at preliminary hearing.  Moreover – and despite Defendant's objection – M.S. recounting her fear of the guns Defendant used "for hunting and deer and stuff" does more to demonstrate that she did *not* consider the weapons in Defendant's home at the time of her assault to be accoutrements of his position as a deputy.  Thus, the Court will consider this fact as undisputed.

<u>Disputed Fact No. 18</u> – Plaintiffs submit as undisputed the fact that "[o]n the day of the first violation, the [Lea County] Sheriff's Department knew that Defendant picked up [M.S.] at the school while he was on duty, and knew that he transported [M.S.] in the county vehicle." Pls.' Resp. 4 (citing *id.*, Ex.1, at 8 (Def.'s Dep. 17:1-24, July 28, 2017)). Defendant responds that "[t]here is no evidence that [Defendant] held a supervisory position within the sheriff's office, or that he was authorized to speak for, or on behalf of, the Lea County Sheriff's Department." Def.'s Reply 4. He reasons, therefore, that any testimony given by him as to what the department knew constitutes speculation, and as such, is inadmissible under the Federal Rules of Evidence. *Id.* (citing Fed. R. Evid. 602 ("A witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter. Evidence to prove personal knowledge may consist of the witness's own testimony.")).

Here, Rule 602 bars the admission of Plaintiffs' Disputed Fact No. 18. The testimony underlying this allegedly undisputed fact is:

> Q.    The Sheriff's Department knew you were doing that, right?
> A.    Yes, sir.
> Q.    They knew that, in fact, you were driving her to school and picking her up from school, right?
> A.    Yes, sir.
> Q.    And they had absolutely no problems with that, right?
> A.    No problem.
> Q.    In fact, the sheriff himself knew you were doing that, right?
> A.    Yes, sir.
> Q.    And he knew that during your shift you would be driving and picking up your granddaughter from school.
> A.    Yes, sir, if I was not doing anything.

Pls.' Resp. Ex. 1, at 8 (Def.'s Dep. 17:1-16). A careful reading of the above reveals that Defendant never gave a *foundation* for any personal knowledge of the above statements. Defendant simply asserted, without additional basis, the twin facts that both the Lea County Sheriff's Department and the Lea County Sheriff knew he was driving and picking up M.S. from

school.  How he *personally* knew these facts is left unexplained, thereby rendering the statements mere speculation.  As a consequence, the Court cannot consider Plaintiffs' Disputed Fact No. 18 at the summary judgment stage.  *See Gross v. Burggraf Const. Co.*, 53 F.3d 1531, 1541 (10th Cir. 1995) ("It is well settled in this circuit that we can consider only admissible evidence in reviewing an order granting summary judgment.").

Disputed Fact No. 19 – Plaintiffs allege that the "Sheriff[']s Department approved Defendant in transporting [M.S.] on the day of the first tort."  Pls.' Resp. 4 (citing *id.*, Ex.1, at 8 (Def.'s Dep. 17:1-24)).  As support, Plaintiffs cite to the same deposition testimony underlying Disputed Fact No. 18.  *See supra*, pp. 14-15.

Defendant challenges Plaintiffs' alleged fact by noting that neither party disputes that on the day in question, the school called Defendant personally to pick up M.S.  Def.'s Reply 4.  He further highlights the undisputed fact that the school did not contact the Lea County Sheriff's Department to "send someone to take M.S. home pursuant to a [d]epartment policy," but rather, called Defendant to pick up M.S. based on his familial relationship with her.  *Id.*  These facts, considered alongside the speculative testimony underlying Plaintiffs' alleged fact, lead Defendant to argue "there is no evidence that the Sheriff's Department 'approved' of any conduct undertaken by [Defendant] on May 5, 2010."  *Id.*

Here again, Plaintiffs have adduced no competent evidence to support their allegedly undisputed fact.  Therefore, the Court will not consider it.  Moreover, even if Plaintiffs could prove this fact with competent evidence at the summary judgment stage, whether or not Defendant's employer knew that he was transporting M.S. on the day in question cannot be said to be material to the question of whether Defendant acted under the color of state law when he sexually assaulted M.S. at her home on May 5, 2010.

<u>Disputed Fact No. 20</u> – Plaintiffs assert that "[d]espite knowing that Defendant was taking [M.S.] to school and bringing her home from school while on duty, the Sheriff['']s Department never raised any kind of issue about it or informed Defendant that he could not do that." Pls.' Resp. 5 (citing *id.*, Ex.1, at 10 (Def.'s Dep. 19:18-23)).[3] They quote the following from Defendant's deposition:

> Q.      . . . [I] asked you earlier, was there ever a time when the Sheriff's Department, who knew you were taking her to school and bringing her home from school while you were on duty, did they ever raise any kind of you can't do that anymore?
> A.      No, sir.

*Id.*, Ex. 1, at 10.

Defendant replies that "regardless of what the Sheriff's Department may or may not have authorized, there is no evidence that [Defendant's] conduct plausibly can be attributed to the State." Def.'s Reply 5. He also directs the Court to Tenth Circuit precedent stating that a plaintiff "cannot avoid summary judgment merely by presenting a scintilla of evidence to support her claim; she must proffer facts such that a reasonable jury could find in her favor." *Id.* (quoting *Turner v. Pub. Serv. Co. of Colo.*, 563 F.3d 1136, 1142 (10th Cir. 2009)).

At summary judgment, the Supreme Court has held that the "judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Liberty Lobby*, 477 U.S. at 249. The *Liberty Lobby* Court explained that "there is no issue for trial unless there sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.* (citation omitted). The Court further

---

[3] The Court notes that Defendant stipulated to the fact that "[t]he Lea County Sheriff's Department was aware of, and did not object to, Defendant taking M.S. *to school* while on duty as a deputy sheriff." *See supra*, p. 8 (Def.'s Undisputed Fact No. 24). Defendant has not conceded that the agency knew he was taking M.S. home on the day of the alleged assault.

clarified that where "the evidence is merely colorable or is not significantly probative, summary judgment may be granted." *Id.* (citations omitted).

Under both Supreme Court and Tenth Circuit precedent, an issue of fact is material *only* "if under the substantive law it is essential to the proper disposition of the claim." *Savant Homes, Inc. v. Collins*, 809 F.3d 1133, 1137 (10th Cir. 2016) (quoting *Becker v. Bateman*, 709 F.3d 1019, 1022 (10th Cir. 2013); citing *Liberty Lobby*, 477 U.S. at 248). Whether or not the Lea County Sheriff's Department outright allowed, tolerated, or neglected to disallow Defendant from picking up or dropping off M.S. at school is not essential to disposing of whether at the time of the alleged assaults at M.S.'s home, Defendant was acting under the color of law. Thus, while the Court will consider this immaterial fact as part of the summary judgment proceedings – as Defendant has not refuted it – under the rule in *Liberty Lobby*, this "merely colorable" fact does little to inform whether Defendant's assault of M.S. was conducted under color of law. *See Liberty Lobby*, 477 U.S. at 249. And, because this fact is immaterial, it will not affect this Court's grant or denial of summary judgment.

<u>Disputed Fact No. 22</u> – Plaintiffs advance as an undisputed, material fact that "Defendant did not go "10-7" over the radio, or indicate that he was unavailable for call or temporarily off duty when he picked up Plaintiff from school and molested her." Pls.' Resp. 5 (citing *id.*, Ex. 1, at 13 (Def.'s Dep. 35:1-7)). Defendant contests this fact, arguing that "no testimony was given with regard to [Defendant's] 'on duty' status at the time of the alleged assault." Def.'s Reply 5.

On this point, neither party persuades the Court. This allegedly undisputed material fact is merely a particularized iteration of Plaintiffs' Undisputed Fact No. 14 laced with police lingo. And yet, Defendant specifically admitted Plaintiffs' Undisputed Fact No. 14. *Id.* at 3. Having admitted the former, Defendant cannot now dispute the latter, except in its particulars, and those

particulars are immaterial. The issue of whether Defendant went "10-7" over the radio during his alleged molestation of M.S. – when it is admitted he was on duty – does little to inform whether Defendant's assault of M.S. was conducted under color of law. *See Liberty Lobby*, 477 U.S. at 249. Therefore, this colorable fact does not impact the Court's decision on whether to grant summary judgment.

Disputed Fact No. 23 – For their final allegedly undisputed material fact, Plaintiffs contend that "[a]ccording to Defendant, the Sheriff[']s department sanctioned and allowed deputies to transport minors in the county issued vehicles, while on duty, even at times, in violation of traffic laws." Pls.' Resp. 5-6 (quotations omitted). Defendant aptly replies, and the Court agrees, that "Plaintiff[s'] intimation that [Defendant] was acting contrary to the law by not placing a small child in a car seat is in no way relevant to whether [Defendant] acted under color of state law at the time he allegedly assaulted M.S." Def.'s Reply 5. Naturally, this immaterial fact does not affect the Court's grant or denial of summary judgment. *See Liberty Lobby*, 477 U.S. at 249.

## V.    ANALYSIS

Applying the governing principles of law to the undisputed material facts of this case, the Court concludes that Plaintiffs' evidence is insufficient to establish that Defendant acted under the color of New Mexico state law at the time he allegedly assaulted M.S. on either May 5, or May 15, 2010. This insufficiency is terminal to Plaintiffs' federal case against Defendant. Of the three claims alleged against Defendant, only the § 1983 claim in Count I properly invokes the subject matter jurisdiction of this Court, and that claim - that Defendant violated the civil rights of M.S. by denying her substantive due process - fails. Because it does, and because this Court declines to exercise supplemental jurisdiction over the state tort claims contained in Count I(a) and Count V, the entirety of Plaintiffs' suit against Defendant must be dismissed.

### A.    Plaintiffs' Civil Rights Complaint

The predominant claim before the Court is whether Defendant can be said to have violated the civil rights of M.S. by denying her substantive due process. Plaintiffs assert that Defendant deprived M.S. of her constitutional right to substantive due process under 42 U.S.C. § 1983 when he "intentionally violated the bodily integrity of M.S. by sexually molesting her," and that Defendant did so "under color of law" in a manner that is "shocking to the conscience." Pls.' Compl. ¶¶ 53-55.

### B.    Law Regarding Liability for Violations Under 42 U.S.C. § 1983

Title 42, Section 1983 of the United States Code provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable. For the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia.

42 U.S.C. § 1983 (2012). "To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988). Individual, non-supervisory defendants may be liable if they knew or reasonably should have known that their conduct would lead to the deprivation of a plaintiff's constitutional rights by others, and an unforeseeable intervening act has not terminated their liability. *See Martinez v. Carson*, 697 F.3d 1252, 1255 (10th Cir. 2012) ("The requisite causal connection is satisfied if [the defendants] set in motion a series of events that [the defendants] knew or

reasonably should have known would cause others to deprive [the plaintiffs] of [their] constitutional rights.") (quoting *Trask v. Franco*, 446 F.3d 1036, 1046 (10th Cir. 2006)). Nonetheless, the Supreme Court has made clear that there is no respondeat superior liability under 42 U.S.C. § 1983. *See Ashcroft v. Iqbal*, 556 U.S. 662, 675 (2009) ("Because vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."); *Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 403 (1997).

### C.      Individual § 1983 Liability

Section 1983 imposes liability on any government official who "subjects, or causes to be subjected, any citizen . . . to the deprivation of any rights." 42 U.S.C. § 1983. In the context of individual government actors, the Tenth Circuit has explained that § 1983 liability should be "'read against the background of tort liability that makes a man responsible for the natural consequences of his actions.'" *Martinez*, 697 F.3d at 1255 (quoting *Monroe v. Pape*, 365 U.S. 167, 187 (1961), *overruled in part by Monell v. Dep't of Soc. Servs. of N.Y.C.*, 436 U.S. 658, 663 (1978)). "Thus, [d]efendants are liable for the harm proximately caused by their conduct." *Id.* (citing *Trask*, 446 F.3d at 1046). Or, in terms of recovery, "a plaintiff who establishes liability for deprivations of constitutional rights actionable under 42 U.S.C. § 1983 is entitled to recover compensatory damages for all injuries suffered as a consequence of those deprivations. The recovery should be guided by common-law tort principles - including principles of causation." *Train v. City of Albuquerque*, 629 F. Supp. 2d 1243, 1251 (D.N.M. 2009).

### D.      Color of Law Requirement and Legal Standard

"Under Section 1983, liability attaches only to conduct occurring 'under color of law.'" *Gallagher v. Neil Young Freedom Concert*, 49 F.3d 1442, 1447 (10th Cir. 1995). The "under

color of state law" requirement is a "jurisdictional requisite for a § 1983 action, which . . . furthers the fundamental goals of preserving an area of individual freedom by limiting the reach of federal law . . . and avoiding imposing on the state, its agencies or officials, responsibility for conduct for which they cannot fairly be blamed." *Jojola v. Chavez*, 55 F.3d 488, 492 (10th Cir. 1995). "The traditional definition of acting under color of state law requires that the defendant in a § 1983 action have exercised power 'possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.'" *West*, 487 U.S. at 49 (quoting *United States v. Classic*, 313 U.S. 299 (1941)). "The authority with which the defendant is allegedly 'clothed' may be either actual or apparent." *Jojola*, 55 F.3d at 493. Accordingly, at a base level, to find that an action was taken under color of state law, the court must find that "'the conduct allegedly causing the deprivation of a federal right' must be 'fairly attributable to the State.'" *Gallagher*, 49 F.3d at 1447 (quoting *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 937 (1982)).

In the context of a public employee or peace officer, the Tenth Circuit has directed that, while "'state employment is generally sufficient to render the defendant a state actor . . . [,]' at the same time, it is 'well settled that an otherwise private tort is not committed under color of law simply because the tortfeasor is an employee of the state.'" *Jojola*, 55 F.3d at 493 (quoting *Lugar*, 457 U.S. at 935–36 n.18; *Mark v. Borough of Hatboro*, 51 F.3d 1137, 1150 (3d Cir. 1995)). Thus, "before conduct may be fairly attributed to the state because it constitutes action 'under color of state law,' there must be 'a real nexus' between the employee's use or misuse of their authority as a public employee, and the violation allegedly committed by the defendant." *Id.* The Tenth Circuit has further held that the contours of what constitutes a "real nexus" in any particular case depend on the circumstances:

> The under color of law determination rarely depends on a single, easily identifiable fact, such as the officer's attire, the location of the act, or whether or not the officer acts in accordance with his or her duty. Instead one must examine the nature and circumstances of the officer's conduct and the relationship of that conduct to the performance of his official duties.

*David v. City & Cty. of Denver*, 101 F.3d 1344, 1353 (10th Cir. 1996) (internal citations and quotation marks omitted).

### E.    Substantive Due Process

The Fourteenth Amendment's Due Process Clause provides that "no State shall . . . deprive any person of life, liberty, or property without due process of law." U.S. CONST. amend. XIV, § 1. "[T]he substantive component of the Due Process Clause is violated by executive action only when it 'can properly be characterized as arbitrary, or conscience shocking, in a constitutional sense.'" *County of Sacramento v. Lewis,* 523 U.S. 833, 847 (1998) (quoting *Collins v. Harker Heights,* 503 U.S. 115, 128 (1992)). And, only the most egregious official conduct can be said to be "arbitrary in the constitutional sense." *Collins,* 503 U.S. at 129. The substantive due process standard is "more onerous" than the Fourth Amendment standard. *Butler v. City of Norman,* 992 F.2d 1053, 1054 (10th Cir. 1993).

The Tenth Circuit has emphasized the distinction between tort actions and substantive due process claims, stating that the Fourteenth Amendment is not a "font of tort law to be superimposed upon whatever systems may already be administered by the States." *Perez v. Unified Gov't of Wyandotte Cty./Kansas City, Kan.,* 432 F.3d 1163, 1166 (10th Cir. 2005) (quoting *Lewis,* 523 U.S. at 848). To the contrary, "[o]nly government conduct that 'shocks the conscience' can give rise to a substantive due process claim." *Id.* (quoting *Lewis*, 523 U.S. at 848).

### F.    Plaintiffs' § 1983 Substantive Due Process Claim Against Defendant Fails as a Matter of Law

Plaintiffs' § 1983 claim cannot survive summary judgment. Plaintiffs' civil rights claim rises or falls on the bedrock principle that Defendant, at the time he assaulted M.S., was acting under color of law. *See Gallagher*, 49 F.3d at 1447. Having reviewed relevant law and the undisputed material facts now before this Court, the Court finds that no trier of fact, on the evidence here presented, could find Defendant was acting under color of state law at the time of the alleged assaults. As a consequence, Plaintiffs' § 1983 claim against Defendant must be dismissed.

### 1.  May 15, 2010

Working in reverse chronological order, the Court will first dispose of Plaintiffs' allegations regarding the alleged assault of M.S. that occurred on May 15, 2010. *See* Pls.' Compl. ¶¶ 20, 51-57. Defendant has asserted as undisputed, and Plaintiffs have stipulated, that on May 15, 2010, Defendant was not on duty as a deputy sheriff and M.S. did not think he was working as a deputy sheriff. Def.'s Mot. 7 (Def.'s Undisputed Facts Nos. 53-54). The parties further stipulate that Defendant was not wearing his uniform, not wearing his badge, not carrying handcuffs, and not carrying his firearm on that date. *Id.* at 8 (Def.'s Undisputed Facts Nos. 58-59). Lastly, both sides stipulate that on May 15, 2010, M.S. stayed at the home of Defendant strictly because of their familial ties. *Id.* at 7 (Def.'s Undisputed Facts No. ¶ 57). These stipulated facts make clear that on May 15, 2010, whatever assault Defendant may have committed had absolutely no relation to his employment with the Lea County Sheriff's Department. Therefore, the Court finds that no trier of fact could find that Defendant acted under color of law during this alleged sexual assault of M.S., and Plaintiffs' § 1983 claim to the extent it relates to the events of May 15, 2010, must be dismissed. *See Matsushita Elec. Indus.*

*Co., Ltd.*, 475 U.S. at 587 ("Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial.").

### 2.    May 5, 2010

The alleged incident of May 5, 2010, demands closer scrutiny. On that day, M.S. attended school and became ill sometime after lunch, which prompted the school to try and contact her mother, Tanya Sanchez, to pick M.S. up. Def.'s Mot. 5-6 (Def.'s Undisputed Facts Nos. 38-42). The school was unable to reach Ms. Sanchez, and thereafter contacted Defendant to pick up M.S. because he was her "Papa," or grandfather. *Id.* at 6 (Def.'s Undisputed Facts Nos. 42-43). Defendant, however, was not an ordinary citizen, but a uniformed deputy of the Lea County Sheriff's Department. When he arrived to pick up M.S., he did so in his government-issued vehicle, with his uniform on, badge displayed, and wearing his duty belt, handcuffs, and department-issued firearm. *Id.* (Def.'s Undisputed Facts Nos. 42-43); Pls.' Resp. 4 (Pls.' Undisputed Fact No. 17). Nevertheless, when Defendant arrived at M.S.'s school to pick her up, he did not identify himself as a deputy sheriff, did not put M.S. in handcuffs, did not draw his sidearm, nor did he force M.S. to go with him. Def.'s Mot. 6 (Def.'s Undisputed Fact No. 47). M.S. voluntarily got into the front seat of Defendant's car, believing that Defendant was taking her to her home, which he did. *Id.* at 7 (Def.'s Undisputed Fact Nos. 48-50). Defendant then allegedly assaulted M.S. by rubbing her stomach with olive oil and rubbing her vagina. Pls.' Resp. 2 (Pls.' Undisputed Fact No. 1).

### 3.    Plaintiffs cannot demonstrate Defendant acted under color of law

On these facts, Plaintiffs contend they can survive summary judgment on whether Defendant was acting under the color of state law when he allegedly sexually assaulted M.S. Yet, their arguments focus on the appearance of Defendant on May 5, 2010, rather than on any

*actual* action by a state actor or an action traceable to the State of New Mexico.  *See David*, 101

F.3d at 1353 (holding that the under color of law determination requires more than looking at

any single, easily identifiable fact, such as the officer's attire).  Plaintiffs premise their case upon

the notion that Defendant "showed his authority by presenting himself in his state[-]issued

uniform and badge at the school," "was on duty at the time of the tort," and "used [his] state[-

]issued vehicle as the means to transport the minor victim so that he commit the sexual assault."

Pls.' Resp. 10.  Beyond these surface-level optics, Plaintiffs marshal only the additional rationale

that "because M.S. was a minor, M.S. was required to go with Surratt." *Id.* [4]

    Plaintiffs also cite to the unpublished case of *Bacon v. Allen* to bolster the proposition

that Defendant acted under color of state law.  *Id.* at 9-10 (citing *Bacon v. Allen*, No. 06-1222-

WEB, 2007 WL 1852185 (D. Kan. June 27, 2007) (unpublished)).  In *Bacon*, the defendant

served as a police officer with the Pratt Police Department and knew the plaintiff through the

plaintiff's employment at a local convenience store, where the defendant's wife was her

supervisor.  2007 WL 1852185 at *1.  The defendant's only ties to the plaintiff were the fact that

he would occasionally "pick up [the] plaintiff at her home and transport her to work and back

home from work" and occasionally "drink a beverage [in the convenience store] and talk to [the]

plaintiff while she worked." *Id.*  The defendant had no relationship with the plaintiff beyond

this.

    One night, the defendant, "while on duty and while in uniform, parked his police car in

front of [the] plaintiff's house and knocked on the door." *Id.*  The defendant made small talk in

the home, and left after telling the plaintiff he had to talk to her alone.  He advised the plaintiff

that he would call her to let her know when they could meet and talk, and all the while, she

---

[4] Plaintiffs additionally assert that Defendant transported M.S. in his patrol car with the approval of the Lea County
Sheriff's Department [Pls.' Resp. 8-9], but that assertion, as discussed *supra*, is premised on inadmissible evidence
and incompetent for review at summary judgment. *See supra*, p. 14.

believed he "wanted to visit with her about a bad check case previously filed against her because she had [recently] missed a court date." *Id.* The defendant contacted the plaintiff fifteen minutes later and asked her to meet him at the convenience store. *Id.*

The plaintiff, believing the defendant "wanted to discuss official police business and that she thought she had no choice but to meet him," drove to the store to meet him. *Id.* There, the defendant arrived while on duty, in his uniform, and in his patrol vehicle, and asked the plaintiff to follow him in his police vehicle. He led the plaintiff to a church parking lot, where "he grabbed [the] plaintiff and pushed her against her car, and held her with her stomach down on the trunk." *Id.* The defendant then struck the plaintiff on the buttocks numerous times with a backscratcher and demanded she pull down her pants so he could perform the same assault on her bare buttocks. *Id.* "Feeling frightened and not free to disregard his command," she complied, and he assaulted her one more time on her bare buttocks. *Id.*

The plaintiff later filed a civil rights complaint against the defendant, alleging that he deprived her of her Fourth and Fourteenth Amendment rights by detaining her "without lawful grounds," that she "was not free to leave or to disregard his orders," and "that the incident was not consensual." *Id.* Further, she argued that at all times the defendant "was acting pursuant to his authority as a City of Pratt Police Officer and under color of state law." *Id.*

The defendant filed a motion to dismiss, arguing that the allegations in the plaintiff's complaint were insufficient to show he had acted under color of state law. *Id.* at *2. The plaintiff responded that his actions were taken under color of state law because:

> [T]hey could not have been completed without the authority of his office. [The] [p]laintiff argues an average person in her situation would not have believed she was free to disregard the instructions of the officer. On the other hand, had [the] defendant not been on duty, dressed as an officer, and operating a police vehicle or would have been a private citizen, [the] plaintiff would have felt free to disregard an instruction from him to meet him behind the church to speak.

*Id.* at *3 (internal citations and quotation marks omitted).  The district court ultimately denied the motion to dismiss, finding that the plaintiff "may be able to show that [the defendant] exercised a show of authority – including his uniform, patrol car, his on-duty status, and his commands to [the] plaintiff to follow him – in order to get [the] plaintiff alone and to carry out the alleged assault." *Id.* at *6.  Therefore, the *Bacon* court reasoned that the plaintiff had "alleged a real nexus between [the] defendant's duties and the alleged deprivation of rights." *Id.*

The facts of *Bacon* evince why summary judgment is appropriate in the instant case. Unlike the plaintiff in *Bacon*, M.S. had a long, family-based relationship with Defendant.  On May 5, 2010, Defendant arrived at M.S.'s school to pick her up as her grandfather, and she left with him for that same reason alone.  M.S. knew Defendant worked as a deputy sheriff, and routinely saw Defendant in his uniform, with his badge, firearm, and handcuffs displayed. Therefore, their presence on the day in question did not constitute a "show of authority." Furthermore, Defendant never detained M.S., nor has she made any claim that he did. Defendant, as M.S.'s grandfather, had no need to - and *did not* - use a show of authority to lure M.S. into his patrol car.  To the contrary, she entered the patrol car because he was her grandfather, and because she had ridden in that same vehicle, in the same manner, on multiple occasions prior to May 5, 2010.  Finally, when Defendant perpetrated the alleged assault upon M.S., he did not do so through the use of police commands.

The Supreme Court has held that "[t]he traditional definition of acting under color of state law requires that the defendant in a § 1983 action have exercised power 'possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.'" *West*, 487 U.S. at 49 (citation omitted).  Here, what power Defendant wielded over M.S. did not derive from his position as a deputy sheriff.  Rather, his alleged atrocities were

made possible by his status as her grandfather, and as such, no "real nexus" exists between his authority as a deputy sheriff and his alleged assaults of M.S. *See Jojola*, 55 F.3d at 493. And, because Defendant's conduct cannot be "fairly attribute[ed] to the State," *see Lugar*, 457 U.S. at 937, his "otherwise private tort" cannot be said to have been "committed under color of law" simply because Defendant worked as a deputy sheriff. *See Jojola*, 55 F.3d at 493. To do so would produce the very evil warned against by the *Jojola* court, in that it would "impos[e] on the state . . . responsibility for conduct for which [it] cannot fairly be blamed." *Id.* at 492. Indeed, having examined the nature and circumstances of Defendant's conduct and the relationship of that conduct to the performance of his official duties, *see David*, 101 F.3d at 1353, the Court finds that no trier of fact could find that Defendant acted under color of law during the alleged assault of M.S. on May 5, 2010. Therefore, Plaintiffs' § 1983 claim must be dismissed.

### G.     The Court Declines to Exercise Supplemental Jurisdiction

Defendant has also requested that the Court in its discretion decline to exercise supplemental jurisdiction over the state battery claim pled in the alternative in Count I. *See* Def.'s Mot. 19.[5] Given that the Court has herein dismissed the only federal claim against Defendant over which it had original jurisdiction, the Court will decline to exercise supplemental jurisdiction over the remainder of Count I or the entirety of Count V. *See* 28 U.S.C. § 1367(c)(3); *see also Koch v. City of Del City*, 660 F.3d 1228, 1248 (10th Cir. 2011) ("When all federal claims have been dismissed, the court may, and usually should, decline to exercise jurisdiction over any remaining state claims.") (quoting *Smith v. City of Enid ex rel. Enid City Comm'n*, 149 F.3d 1151, 1156 (10th Cir. 1998)).

---

[5] Defendant asserts that, apart from Count I, he "is not named as a defendant any [sic] other count of the Complaint." Def.'s Mot. 19. This assertion appears to be inaccurate, given that he is also named – as the sole defendant – in Count V. *See* Pls.' Compl. 8, ECF No. 1; *see also* Def.'s Answer ¶¶ 87-90, ECF No. 21 (denying liability as to Count V). Nonetheless, the Court in its discretion will treat in identical fashion the two state battery claims that remain pending against Defendant.

## VI.    CONCLUSION

For these reasons, **IT IS ORDERED** that Defendant Danny Surratt's Motion for Summary Judgment [ECF No. 69] is **GRANTED**.

**IT IS FURTHER ORDERED** that the federal civil rights version of Count I of Plaintiffs' Complaint is **DISMISSED WITH PREJUDICE**.

**IT IS FURTHER ORDERED** that the state battery claims in Counts I and V are **DISMISSED WITHOUT PREJUDICE** for refiling in a proper state forum.

**IT IS SO ORDERED.**


_____
THE HONORABLE GREGORY J. FOURATT
UNITED STATES MAGISTRATE JUDGE
***Presiding by Consent***